THE B. B. NO. 167, etc.

THE HAZEL HINDS.

BURNS BROS., Inc., v. CITY OF NEW YORK.

O'BOYLE v. SAME.

DELAWARE, LACKAWANNA & WESTERN COAL CO. v. SAME.

District Court, S. D. New York.
Jan. 25, 1938.

56

Macklin, Brown, Lenahan & Speer, of New York City (Richard F. Lenahan and Charles J. Carroll, Jr., both of New York City, of counsel), for libelants.

Paul Windels, Corporation Counsel, of New York City (P. Fearson Shortridge and John T. Condon, both of New York City, of counsel), for respondent.

LEIBELL, District Judge.

Suits in admiralty by Burns Bros., Inc., as owner of the barges B.B. No. 167, B.B. No. 29, and B.B. No. 52, by Anthony O'Boyle, Inc., as owner of the barge Hazel Hinds, and on behalf of the barge captain for loss of personal .effects, and by the Delaware, Lackawanna & Western Coal Company, as owner of a part cargo of coal laden on the barge B.B. No. 167: the City of New York was named respondent in all three actions and, under Admiralty Rule 56, 28 U.S.C.A. following section 723, impleaded Burns Bros., Inc., as corespondent in the latter .two actions. The alleged causes of action arose under the following circumstances:

In March, 1936, the city was the owner of two piers located on the east bank of the North (Hudson) river at 134th street and 135th street, respectively. The 135th street pier was constructed in the years 1911–1912. It was about 60 feet wide and 540 feet long: the 134th street pier was about the same width, but not quite as long. At the bulkhead of the slip, between the piers, Burns Bros., Inc., operated a coal yard on which there were several structures, including a coal pocket and hoist at the south-

erly half of the bulkhead and a screen and storage shed on part of the northerly half. The bulkhead ran at a slight angle towards the southwest, so that its frontage was about 165 feet on the water of the slip. Title to the land under water in the slip was vested in the trustees of a trust made by one William Gordon. By a lease dated November 25, 1935, the owner leased to Burns Bros., Inc., for five years, beginning December 1, 1935, and ending November 30, 1940, the bulkhead, together with all the right, title, and interest of the owner, in and to the land under water in front of and adjoining said premises. Burns Bros., Inc., as lessee, had full control of the bulkhead and lands under water, subject to the right of the public to use the slip for navigation and subject to the right of the city of New York to charge wharfage for vessels mooring at its piers.

In the operation of its coal pocket at the bulkhead, Burns Bros., Inc., unloaded coal barges carrying different grades of coal. Many of the barges were kept in the slip for weeks at a time and would be moved up to the bulkhead and partially unloaded and then tied up to the south side of the 135th street pier until additional quantities of their particular grade of coal were required to fill customers' orders, when they would be again moved alongside the bulkhead for further unloading.

In the early part of March, 1936, a great number of large ice floes floated down the North river; the ice conditions, although unusual, were not unprecedented. The 135th street pier had resisted similar ice pressure in other years; there was no reason to expect that it could not withstand the floes and masses of ice that might strike or pile up against it. The pier was the most northerly pier owned by the city on the North river. There were no other pier structures of any size north of the 135th street pier for a mile and the pier was exposed to the ice floes coming down the river on an ebb tide.

At about 2:15 a. m. on Friday, March 6, 1936, an especially heavy floe, carried by the ebb tide, struck the outer end of the 135th street pier on the north side and shifted a section of the superstructure, 180 feet long, about 20 feet to the south, so that it slid down into the water, like a ramp, at a slight angle down stream.

At that time Burns Bros., Inc., had a number of barges in the slip, some of them moored on the south side of the 135th street pier at the shore end. No damage was done to any of the barges. At about 10 a. m. on the morning of March 6th a representative of the Dock Department notified Burns Bros., Inc., of the dangerous conditions following the collapse of the outer end of the pier and advised them to remove the barges. The Dock Department on the following Monday, March 9th, towed a pile driver to the 135th street pier with men and tools. The workmen had orders to build a high fence at the land end of the pier excluding the public from its use, to pick up any driftwood from the damaged portion of the pier, and to make secure any part that might break away.

On the morning of March 12, 1936, Burns Bros., Inc., or the barge captains, because of threatening ice conditions, moved some of the barges from the south side of the 135th street pier and moored them to the north side of the 134th street pier. The 134th street pier was not in good condition. There were danger signs posted on it, and it had not been in public use for about six years. Five barges were moored abreast of each other on the north side of the 134th street pier as follows: Barge B.B. No. 167 was alongside the pier, with the B. C. Hendrickson next, then the B.B. No. 52, next the B.B. No. 29, and the Hazel Hinds as the outside or most northerly barge. These barges as moored abreast had a total wide of about 120 feet. They were moored so that their shore ends were about 100 feet from the bulkhead. The B.B. No. 167 was about 92 feet long and the Hazel Hinds was 115 feet long. In addition, the B.B. No. 46 was moored at the inshore end of the north side of the 134th street pier and the B.B. No. 16 outshore of the tier of barges. Another B.B. barge, the Irene Kavanagh, was moored on the south side of the inshore end of the 135th street pier. All of the five barges moored abreast of the 134th street pier had been in the slip continuously from some time prior to March 6th.

At about 3:30 p. m. on March 12th there was a second collapse of the 135th street pier with the result that the city's pile driver, which was moored on the southerly side of said pier about 150 feet from the shore and a 200-foot section of the superstructure of the pier and also great masses of pack ice that had piled up on the north side of the pier, swung down towards the tier of five barges, colliding with them so that two of them (B.B. No. 167

58

and the Hazel Hinds) sank and the others were squeezed and damaged. These suits are for the damages thus sustained.

I. Burns Bros., Inc., libelant, against the city of New York, respondent, for damages to the barges B.B. No. 167, B.B. No. 29, and B.B. No. 52.

Libelant correctly contends that the collapse of the pier creates a presumption of negligence and casts upon respondent the burden of rebutting this presumption under the doctrine expounded in Pacific Mail S. S. Co. v. Panama R. Co.; 2 Cir., 251 F. 449. Libelant also claims that respondent has failed to meet the burden of this presumption and has not even attempted to explain the cause of the pier's collapse. With that I do not agree.

The evidence at the trial established the following facts: The 135th street pier was constructed in the years 1911-1912 at a cost of $52,000 and was of the standard unshedded or open pier type, generally in use in New York Harbor. In 1922 and 1923 it was redecked at a cost of $35,551.-76. In 1924 repairs, including 10 oak piles, cost $18,671.93. In 1925 further repairs, including 5 oak piles, cost $9,465.32. In 1927 the city spent $6,326.16 for repairs, including 5 oak piles. In 1931 repairs cost $912.59. In 1932-3 the pier was substantially rebuilt above the low-water mark at a total cost of $65,888.57 and 91 piles were used in making these extensive repairs. The method used in splicing the piles was of a recognized standard type. In 1934 further repairs cost $621.16.

Libelant contends that the condition of the piles, braces, and decking as exposed after the collapse of the pier shows that the pier had not been reconstructed properly in 1932-3 and that many of the timbers and piles were old and rotten. There was testimony of experts, called by the libelant, that a large percentage of the piles were plumb-posted instead of being bench-capped and that if the whole upper section of the pier had been bench-capped it would have been stronger. The city's witnesses testified that some rows of piles in the pier had been bench-capped, but that where in a row of piles a number of the piles were good, it would have been a sacrifice of strength to cut down the sound piles as well as the rotten ones and that in such cases the better method would be to cut off and plumb-post the bad piles and then rebuild the decking over them and the good

piles. In the bench-capping method of reconstructing a pier, all the piles in a row are cut down to the same level, at a point a few feet above mean low water and then a bench of 12″ by 12″ timbers is built across each row of piles and on that are erected posts and bracing, and above the posts the decking. Libelant's experts claimed that this bench-capping method would have produced a new and stronger superstructure and that bench-capping is the proper method to follow where more than 50 per cent. of the piles need repairing. There is much to be said in favor of both methods, but the decision as to which method to use naturally rested with the engineers who knew the conditions existing at the time the repairs were made. The city's engineers and dock builders in charge of the extensive repairs to this pier in 1932-3 were men of experience, familiar with harbor conditions. I see no reason for holding that they used the wrong method in reconstructing the superstructure or that they failed to do their job thoroughly and without skimping it. By far the greater number of the piles that broke off when the pier collapsed on March 6th and again on March 12th were broken off below where they had been plumb-posted, most of them below the low-water line and many below the mud line.

When the second collapse occurred on March 12th, the superstructure of the 135th street pier swung gradually towards the 134th street pier under the pressure of the pack ice and the ebb tide, and besides striking the coal barges demolished part of the 134th street pier. The outer end of the 135th street pier lodged in the wreckage under the 134th street pier and it was necessary to cut off that part of the 135th street pier in order to float and tow away the balance of its wrecked superstructure. There is no question about the deteriorated condition of the timbers and piles in the 134th street pier. Some of its wreckage was dredged and lifted from the slip by a Merritt-Chapman dredge ordered by the city to the slip on the 12th or 13th of March. It may be that many of the rotten timbers removed from the slip came from the 134th street pier. The testimony of the city's witnesses as to the extensive repairs made to the 135th street pier in 1932-3 at a cost that exceeded the original construction cost of the pier in 1912, far outweighs the evidence produced by the libelant as to the condition of some of the piles and timbers

after the collapse of the pier in March, 1936.

From 1933 to March 6, 1936, the pier was in a good usable condition. There were no signs of deterioration that would suggest that it could not withstand any ice conditions that might prevail in the river at that season of the year. Libelant, Burns Bros., Inc., used it daily. The city had no reason to anticipate the collapse of the dock under pressure of the ice on March 6th. Under the circumstances, I find that respondent was not negligent. Girard Point Storage Co. v. Roy, 3 Cir., 93 F. 574.

■ Libelant further contends that respondent was negligent in mooring the pile driver to the southerly side of the 135th street pier and in failing to send tugs or coast guard cutters up the river to break up the large floes of ice, subsequent to the first collapse on March 6th. The pile driver, 28 feet wide and 55 feet long, drawing 34 inches of water, was sent to the pier with men and tools on March 9th. Due to the ice conditions, nothing could be done to reinforce the pier in the six days between the first and second collapse. It does not appear that the mooring of the pile driver on the south side of the pier in any way contributed to the second collapse. The collapse of March 12th was due to the pressure of the accumulated masses of broken ice on the northerly side of the 135th street pier, the force of the ebb tide, and the weakened condition of the pier as a result of the first collapse of March 6th. The mooring of the pile driver on the southerly side of the pier may have been unwise under the circumstances, but it can hardly be termed negligent or a contributing cause to the second collapse of the pier. Further, the pile driver was there performing a duty owed the public, erecting a fence so as to keep the public from going upon the pier in its damaged condition. When the second collapse started, the men on the pile driver made every effort to so maneuver it as to avoid any collision with respondent's tier of barges that were only 20 feet away. Their efforts were unsuccessful. Nor should we overlook the fact that the libelant, Burns Bros., Inc., had a barge, the Irene Kavanagh, tied up on the south side of the 135th street pier at the time of the second collapse, inshore from the pile driver. If that barge had not usurped that position, the pile driver might have been moored there or maneuvered to that point, and since that innermost section of the pier was not carried away by the second collapse, the pile driver would not have been affected or involved in any way. No fault can be charged to the city for having the pile driver just where it was when the second collapse of the pier occurred on March 12th.

■ As for libelant's contention that the city should have used tugs and coast guard cutters to break up ice floes coming down the river before they reached the vicinity of the 135th street pier, it is difficult to conclude just how beneficial this would have been under the conditions prevailing in the early part of March, 1936. Moreover, it would seem that any attempt to dislodge the ice which was packed on the northerly side of the pier would have been useless and might have resulted in aggravating the situation, rather than relieving it.

Libelant called an experienced tug boat captain in an effort to show that the city after March 6th could have sent tugs to break up the ice floes north of the 135th street pier. But there is no telling from hour to hour what floes will come. Breaking up the floes would not and did not prevent the steady accumulation of large blocks of ice in the cove at the north of the 135th street pier and alongside the pier. One of libelant's witnesses, who controlled the dispatching of a fleet of tugs for harbor and river service, testified that he would not consider it safe to use a tug to break up the ice on the north side of the 135th street pier under the conditions that prevailed between March 6th and 12th. The river was full of ice and the tide was running out when the pier collapsed on March 12th. The superintendent in charge of the Burns Bros., Inc., coal pocket testified that on March 6th he thought that any ice that might strike the 135th street dock in the future would not do any more damage; that the dock was then just as safe as it had been in its original position; and that he did not expect anything to happen.

As to the ice conditions prevailing in the North river between March 6 and 12, 1936, we have the testimony of Capt. Hall in command of the coast guard ice breaker, the Commanchee, a 1000-ton vessel of steel, constructed with a reinforced bow for ice breaking work. He described his trip up the river from March 7th to 11th, breaking a channel through the ice from a point 2 miles north of the George Washington bridge to West Point. The river was fro-

zen over from shore to shore all the way and the ice varied in thickness from 12 inches to 27 inches. He broke up several large floes immediately north of the 135th street pier. But it was not an ice floe that finally demolished the pier on March 12th —it was the accumulation of great masses of broken ice, cakes more than a foot thick, pressed against the north side of the pier by the ebb tide that caused its second collapse. The temperature was rising on the 10th and 11th. On March 12th fog conditions prevailed all day. This loosened and broke up the ice fields. Nothing thaws ice faster than a fog.

From March 6th to March 12th the city was not a wharfinger as regards the libelant. The 134th street pier had been closed down, and danger signs posted upon it, for about six years, and the 135th street pier was closed down after the first collapse on March 6th. No wharfage was charged libelant, Burns Bros., Inc., from March 6th to March 12th on the 135th street pier, and, of course, none for the 134th street pier, although libelant, of its own choice, moored barges to the 135th street pier and later to the 134th street pier during that period. As a matter of fact, libelant had no legal right to tie up at either the 134th street or the 135th street piers from March 6th to March 12th, even though it admittedly had the right, at its own risk, to keep its barges in the slip or moored to its own bulkhead.

■ The libelant was notified of the danger on the morning of March 6th after the first collapse. Moreover, the general warning conveyed by the wrecked condition of the outer end of the pier would of itself be adequate notice. The libelant could see it all from its office windows near the bulkhead. The Hendrick Hudson, 2 Cir., 203 F. 694; United States Trucking Corp. v. City of New York, 2 Cir., 18 F.2d 775. "No one needs notice of what he already knows" and "knowledge of the danger is equivalent to prior notice." Lane v. City of Lewiston, 91 Me. 292, 296, 39 A. 999, 1000, quoted in District of Columbia v. Moulton, 182 U.S. 576, 21 S.Ct. 840, 45 L. Ed. 1237.

In Hastorf v. Hudson River Stone Supply Co., D.C., 110 F. 669, a libel was filed to recover damages sustained by the libelant's scow which had been moored to respondent's bulkhead loading a cargo of crushed stone. The structure on which the stone bins were located gave way and the bins fell upon libelant's scow. However, about half an hour before the accident one of respondent's employees noticed that the structure was cracking and warned the scowman in charge of libelant's boat of the danger, telling him to get the boat out of the way. This warning was not heeded. The court dismissed the libel, Judge Brown saying, at page 670 of 110 F.:

"Upon this proof, I think that there is not only failure to fix any negligence or want of care upon either of the defendants, but that the evidence of neglect on the part of the scowman after due notice, is such as to charge him with the responsibility. It was a very simple matter to remove the scow from danger. There was a strong current, and by simply casting loose the mooring line running up stream, the scow would in a few moments have swung down stream and have been out of reach of harm.

"The scowman being employed by the libelant and furnished by him along with the scow, the libelant is chargeable with the neglect of his employé, and is consequently precluded from recovery. See Quinn v. Construction Co. (C.C.) 46 F. 506."

In the instant case some of the bargemen, fearing a further collapse of the 135th street pier, on the morning of March 12th moved their barges to the northerly side of the 134th street pier. They took some precautions but not enough. The barges could have been towed out of the slip. When they were moored abreast of the 134th street pier, the Hazel Hinds, the outermost barge, was only about 45 feet from the 135th street pier and 17 feet from the pile driver. Any pressure against that barge was likely to squeeze and damage the inside barges and that is what later happened when the 135th street pier collapsed a second time at 3:30 p. m. Burns Bros., Inc., had knowledge of the "weather and the condition of ice in the river" and of the weakened condition of the pier on the morning of March 12th. It knew of the dangers to the barges, "had means of relieving it, was under a duty to relieve it, and failed so to do." The Junior, 2 Cir., 279 F. 407, 409.

In the instant case respondent has shown itself free from negligence. The 135th street pier was properly constructed and maintained. After the collapse of March 6th, respondent closed the pier to

public use and warned libelant of the danger. Libelant did not heed the warning and in fact exposed these barges to the danger that resulted in their damage. The libel is dismissed.

■ II. Libel by Anthony O'Boyle, Inc., as owner of the barge, Hazel Hinds, libelant, against the city of New York, respondent, and Burns Bros., Inc., impleaded.

Libel by the Delaware, Lackawanna & Western Coal Company, as owner of a part cargo of coal laden on the barge, B.B. No. 167, libelant, against the city of New York, respondent, and Burns Bros., Inc., impleaded.

As against the city of New York: The evidence does not show just what relationship existed between Anthony O'Boyle, Inc., and Burns Bros. Inc.; whether Burns Bros., Inc., was a charterer, consignee, agent, etc., of the barge, Hazel Hinds. Similarly, it does not appear whether the Delaware, Lackawanna & Western Coal Company had chartered a portion of the barge B.B. No. 167, or whether Burns Bros., Inc., were consignees, bailees, etc., of the coal. However, it does appear that Burns Bros., Inc., was in full control of the movement and location of the barges while they were in the slip between the 134th and 135th street piers. Hence the warnings of danger as communicated to Burns Bros., Inc., were sufficient notification to the libelants (in addition to the conditions that were visible to Burns Bros., Inc., and the barge captains) and they are precluded from recovering as against the city of New York for the reasons stated in the first part of this opinion. Libels are dismissed as against the city.

■ As against Burns Bros., Inc.: These libels were originally filed against the city of New York. The city, under Admiralty Rule 56, 28 U.S.C.A. following section 723, impleaded Burns Bros., Inc., by petition. Copies of the petition were served upon Burns Bros., Inc., and both libelants. However, Burns Bros., Inc., did not answer, nor did the libelants adopt said petition. As above stated, the relationship between Burns Bros., Inc., and the libelants has not been disclosed. Under the circumstances, it is impossible to determine their relative rights and liabilities.

This opinion contains the court's findings of fact and conclusions of law.

Submit decrees accordingly.