**TODD ATLANTIC SHIPYARDS CORP. v. THE SOUTHPORT et al.**

**UNITED STATES v. THE SOUTHPORT et al.**

Nos. 1047, 1048.

United States District Court
E. D. South Carolina, Charleston Division.

Jan. 26, 1951.

———◆———

Hagood, Rivers & Young, Charleston, S. C., George L. Varian (of Crowell & Rouse), New York City, for Todd Atlantic Shipyards Corp.

Moore & Mouzon, Charleston, S. C., for the S. S. Southport.

Ben Scott Whaley, U. S. Atty., Charleston, S. C., William T. Foley, Jr., Atty., Admiralty and Shipping Section, Dept. of Justice, Washington, D. C., for the United States.

Buist & Buist, Charleston, S. C., for City Compress & Warehouse Co.

WARING, Chief Judge.

On January 15, 1949, the S. S. Southport, being then and there berthed alongside the wharf of the City Compress and Warehouse Company in the Cooper River in the Port of Charleston, South Carolina, broke from her moorings, drifted down the river and came into collision with a floating dry dock which was moored at the shipyard plant operated by Todd Atlantic Shipyards Corporation. The floating dry dock. known as "YFD-15" is a wooden five-sectioned floating dry dock of 9,000 tons capacity.

The libellant, Todd Atlantic Shipyards Corporation, which is hereinafter referred to as Todd, was the owner of one section of this dry dock. The other sections were owned by the United States of America. The whole dry dock was moored at the Todd plant and was under operation by it. As a result of the collision of the ship with this dry dock, certain of its sections were damaged and there was also some damage to piers at which the dock was moored.

Both Todd and the Government filed libels against The Southport in rem and against South Atlantic Steamship Line, Inc., the owner of said vessel in personam.

The steamship Southport is owned by South Atlantic Steamship Line, Inc., a corporation. The last named appeared as claimant; and in turn impleaded and filed a cross-libel against City Compress and Warehouse Corporation which was the owner and operator of a wharf and dock situate at the end of Charlotte Street in the City of Charleston, South Carolina. City Compress and Warehouse Company (hereinafter called Compress) responded and in turn brought its cross-libel against the ship and its owner. The issues in the two cases being identical except for amount of damages sustained by libellants, the Court consolidated the causes and they were heard together as one.

The respective amounts of damages suffered by the different parties were stipulated and are as follows: the section of the dry dock owned by Todd was damaged to the extent of $13,513; damages to the sections of the dry dock and the piers owned by the Government amounted to $46,916; the damages to the ship for which claim is made by its owner against Compress is $2,-862.15; and the damage to the wharf and facilities of Compress for which claim is made against the ship and its owner is $2,-122.

The libellant's claims are based upon allegations of negligence on the part of the vessel and those in charge of her in failing to have the vessel securely moored and to attend to the moorings and keep them in proper condition; and to take proper precautions to avoid colliding with the dry dock after the moorings had come loose. The ship and its owner admit that the ship went adrift and was in collision with the dry dock but they assert that all of that was brought about by the failure of Compress to furnish safe and adequate mooring facilities. And they, in turn, pray judgment against Compress for the damages suffered by them. Compress denies any negligence on its part or inadequacies or failure of its mooring facilities and alleges negligence in the management and handling of the ship in conducting its mooring and handling of the ship after it had broken away and prays judgment for its damages.

This Court has jurisdiction of all the parties and issues involved in this cause. Admiralty Rule 56, 28 U.S.C.A.

The factual situation is as follows:

On the early morning of January 15, 1949, the S. S. Southport came into the port of Charleston. She was met by a harbor pilot and piloted up to and in the vicinity of the City Compress wharf. Tug boats assisted in warping her into her berth alongside the Compress wharf; the berthing and mooring being under the supervision of the tug master who, in this instance, was the master of one of the tug boats of the White Stack Company. The ship lay with its starboard alongside the face of the Compress wharf, its bow pointed southward or downstream. The choice of whether ships were moored with bow downstream or upstream was generally determined by the state of the tide at the time of docking. It is well known that a ship is easier to handle and berth against the tide. Tide was flooding when The Southport was placed at this wharf. The ship was moored at approximately 3:00 A. M. The weather was good and fair. There was no unusual wind or tide. The tide table showed that the rise and fall of the tide in this harbor is normally five and eight-tenths feet. On the day in question, low tide occurred at 12:50 A.M., high tide at 7:19 A. M., and the following low tide at 1:46 P.M. The ship was moored as hereinafter more particularly described and after the turn of the tide certain of her lines were tended by taking up slack at approximately 9:00 A.M. and again at approximately 10:30 A.M. The breaking loose of the ship which resulted in its drifting down stream and is the cause of the incidents hereinafter detailed, occurred at approximately 11:15 A.M.

It is important to fully understand the way the ship was moored. There was introduced in evidence a sketch or plan which graphically illustrates how the ship was lying at the wharf and how she was moored. This is Exhibit A which was introduced by the respondent ship. This sketch does not purport to be drawn to exact scale and the distances and dimensions are not given on it. However, it clearly illustrates exactly how the ship lay at the wharf and what lines were holding her. A photographic copy of this exhibit is attached to this opinion and will be referred to from time to time.

On the copy here attached are some marks and notations in red [1] which were not upon the exhibit as introduced but which have been superimposed by me as useful in explanation and illustration of some of the evidence hereinafter discussed. There is one notation on the sketch that may be misleading and should be corrected. It will be noted that one of the spring lines from the ship ran to a mooring that is marked on the sketch "wooden bollard". All of the witnesses corrected this error by stating that this was really a metal bitt securely and well fastened on wooden supports and bolted to the wharf.

The uncontradicted testimony showed that on the arrival of the ship, she was tied up in the following manner which is illustrated by the sketch. The forward part of the ship was secured by four lines. It must be remembered that the ship was pointing downstream and in an approximate southwardly direction. There was a line coming out of the ship on the port side a few feet aft of the bow. This line ran and was secured to a dead man on the shore south of the wharf. There was next a line coming out of the starboard side a short distance from the stem that extended and was fastened to a dolphin which last consisted of seven pilings strapped together with wire. That acted as a breast line. Then, there were two spring lines, one coming from the forward part of the vessel and running aft and secured to a steel cleat on the face of the wharf, the other coming from a point a little forward of amidships and running forward along the side of the vessel and the wharf to a metal bitt fastened to the face of the wharf (this bitt is the one marked on the sketch "wooden bollard"). Now going aft, the mooring was different and this is perhaps the most important point in the case because while there has been no criticism of the mooring of the ship forward, the method of mooring aft is under fire. The aftermost part of the ship was secured by three lines. First, there was one line that was extended and fastened to a seven piling wood dolphin which dolphin was strapped with wire. This line ran at an angle approximately 45° to the keel of the ship and

the face of the wharf. And there were two mooring lines running to a deadman ashore to the north of the wharf and these two lines came from points near the stern of the ship, one on the starboard side and the other on the port side. Perhaps it might be well to explain what is meant by the different types of lines. A mooring line is generally a line running from a vessel to some object on or near the shore or some fastening in the water to prevent the ship from moving. But other specific forms of lines are usually made use of. A breast line is a line extending from the vessel to the shore approximately perpendicular to the ship's keel and its purpose is primarily to keep the ship close to the shore or wharf. Spring lines run approximately parallel to the keel or side of the vessel and the purpose of these is to keep the ship from moving forward or aft and alongside the wharf. Now the mooring of the Southport forward included a mooring line to the deadman on shore; and a breast line to the dolphin and two spring lines. So that all of the nautical witnesses agreed that the mooring forward was the standard and regulation method in use. But the mooring aft came under criticism from some of the witnesses. The line from the ship to the dolphin did not run at right angles to the vessel or the wharf and so was not a regulation or generally accepted breast line nor did it run parallel and so could not be definitely called a spring line. As a matter of fact, it was supposed to act as both yet was not entirely fit for either. There were two lines to the dead man and these also, because of their angles were neither true breast lines nor spring lines although they had the effect of acting as both. And one very serious question in this case is whether these three lines acted sufficiently well to obviate the necessity of putting out the regular breast and spring lines. The ship maintains that, considering the shore facilities, the moorings were ample and adequate. The Compress maintains that it had and furnished adequate facilities and that the ship was negligent in making use of these.

---

**1.** See starred note in plat.

As heretofore stated, the ship was moored in the manner above described at approximately 3:00 in the morning. On the arrival of the ship and according to custom, the docking master was in charge of the method of mooring the vessel. It was shown that the docking master directs what lines are to be placed and persons employed by the wharf catch the lines as they are thrown ashore and place them on the shore facilities as directed. It is, therefore, the responsibility of the docking master who is employed by the ship and ultimately the responsibility of the ship as to how many and what lines are used and where they are to go. The responsibility of the owner of the wharf, of course, is to supply adequate facilities for mooring and the crew to do the actual fastening or tying up of the lines. In this case, there is no claim that the lines were improperly tied. The issues between the ship and the Compress are whether the proper points of mooring were selected by the ship and whether safe facilities for mooring were furnished by Compress. All of the lines were of eight-inch manila rope and these hawsers were in good condition.

Nothing requiring notice happened until about 8:00 in the morning when stevedores who were to perform the storing of cargo arrived. The ship had called at this wharf to take on a cargo of cotton. The ship was already partially loaded. Her draft forward was approximately 17 feet and her draft aft approximately 27 feet, most of the cargo having heretofore been loaded in the stern. The stevedores reported; they were put to work and all parties went on with their regular and accustomed business. The Master of the vessel left the ship rather early in the morning and went ashore to see his agents and perform customary duties. The First Officer was given leave and went ashore. The Second Officer was in charge of the ship aft and the Third Officer in charge of the ship forward.

At approximately 9:30 in the morning, because of the lowering of the ship due to ebb of the tide, some of the lines appeared to be slackened. The Second Mate testified (and he was corroborated by members of the crew) that he caused the two mooring lines that ran from the sides of the stern to the deadman aft to be taken in so as to render them taut and bring the ship close to the wharf from which she had drifted a little. The testimony from the officer and crew was to the effect that this was done in proper and approved method by placing a stop on one of the lines, then taking the line itself from the bitt to the capstan taking in the necessary amount of slack and replacing with the use of a stop to the bitt. This was done as to each of the two lines. The same group of witnesses testified as to a similar operation at approximately 10:30. They say that there was nothing unusual in regard to the operation of these lines; that there was no particular undue strain on them and that the ship was heaved back against the side of the wharf without any difficulty. The testimony is that these operations took care of all the slacking which needed to be remedied and that there was no necessity to take in the line to the dolphin. There was no testimony as to any forward lines being changed or tended.

On behalf of Compress, some testimony was produced by witnesses who claim that the heaving-to of the ship was done improperly. There was testimony to the effect that the ship had gotten a considerable distance away from the wharf and that the two lines to the deadman were slackened when they were moved to the capstan to such an extent that they sagged and fell into the water and that when the power was put on and the lines were heaved in, they came up suddenly, and oil and water were squeezed out of them, this being caused by the excessive strain and tension. The ship's crew testified that these operations were done exclusively by members of the crew and that the acts were done in proper and accepted fashion. The testimony of some witnesses on the shore, that is to say, on a wharf lying close to the northward of the Compress wharf, was that those heaving operations were performed by a number of men who were apparently not members of the crew. The witnesses testified that they did not know any of the crew or men performing the operations and they base this inference as to their being non-crew members upon the fact that the entire crew was made up of white men

and, according to these witnesses, that colored men were seen handling lines on the ship. And it is testified that the stevedoring group was composed of colored men. There was testimony by one witness that these two lines were tightened to such an extent and had such a strain upon them that he feared they would part. This witness was standing near where the lines run to the deadman and he states that he was so apprehensive that he ordered a crew of workmen who were performing some duties on barges near where the lines ran to move away from the lines for fear of breakage and injury. This witness also testified that shortly after the heave-to but before the final blow came, that he noticed that the earth was cracked near where the dead man was buried. If this testimony be true, it is very remarkable that this man who was a tug-boat man, accustomed to ships and water front work with the knowledge that these lines were the mooring lines of a large ship, made no report of this and did not warn anyone that there was danger of the dead man coming loose.

Shortly after 11:00 A.M., say about 11:15, came the occurrence which brought about this disaster. The officers of the ship testify that the first they knew of any trouble with the ship were calls and warnings from the shore. They discovered that the ship was moving out by the stern and that the outgoing tide, which, at that time was running about five miles per hour, was swinging the stern of the ship away from the shore. The two lines from the stern to the deadman were loose and it was discovered that the deadman had been pulled out of the ground and also the lines were still securely fastened to it and it was being hauled over the ground and, of course, was of no further use for mooring. Some of the parties on the shore, who were working around the barges, realized that the dragging of this mooring device along the shore line and over their barges would cause wreckage and perhaps tear loose the barges from their own moorings and they chopped these hawsers thus separating them from the deadman and rendering them useless to the ship for any purposes of mooring.

It is proper here to describe this mooring device known as a deadman. It is rather remarkable that no real testimony was produced as to exactly when and how the deadman was constructed. Interrogatories (which are in evidence) were propounded by the ship to Compress. It was asked when and by whom the deadman was installed and for a description of the method of construction. The answer was "Salmons Dredging Company in April, 1946" and then a description was given which was substantially as shown by later testimony. But when the case came to trial no witness from the Salmons Dredging Company was produced or any explanation given as to whether this company had any knowledge, information or records which were available as to the method of construction of the deadman. No representative of the Salmons Dredging Company appeared in the trial. It was stated in open court by the proctors for Compress that the two men who had actually done the installation were dead. It was further stated that one was named "Jack" and one named "Dan" but that not even their last names were known. And there the matter ended so far as to whether Salmons Dredging Company had been consulted or called upon for information. There was not a scintilla of evidence that Compress had ever had anyone in its employ or under its control examine, inspect, supervise, or make any inquiry into the status of the deadman and as to whether it had remained safely buried or as to the condition of the soil or ground surrounding it. There was one witness, not connected with Compress, who said he had seen the work of installation going on and that according to his recollection, this deadman consisted of a long hewn log, ten or twelve feet long, and buried about six feet in the ground parallel to the edge of the shore a considerable distance back from the shore line; that around this log there was fastened a substantial steel wire cable and that an end of this cable came out of the ground and was fastened to a shackle, to which latter mooring lines of ships would be fastened. This witness also claimed that the log so buried was protected by the driving

of a 3 X 6 inch piling in a diagonal direction so as to further anchor it down. After the deadman came loose on this day in January, measurements were taken of it and it was found to be a solid wooden log 12 X 12 in diameter and 14 feet in length. It was in good sound condition, without rot, and the steel wire cable fastened to it was sound and in good condition also as was the shackle. There was no testimony as to whether any piling or supports were found and the photographs of the location failed to show the existence of these. If it be true that this deadman was constructed as testified to and if it continued that deep in the ground and the covering earth was not removed or eroded, it would seem that such a mooring device which was still intact when it was pulled out of the ground could not possibly have been moved by any reasonable force and it hardly seems possible that it could have been pulled out of the ground without the parting of the steel cable or the manila hawsers. And yet this happened and so it must seem that this deadman could not have been (on the day of the accident) in the same condition that this witness claimed it was in when constructed.

When the deadman came out of the ground and the ship thus lost its main moorings aft, events moved speedily and it is difficult to follow exactly what happened although we can get a fairly good overall picture. According to the Master and Second Mate, the tide was carrying the stern of the ship out into the stream rather fast. There was now left only one line aft; merely the hawser running from the ship to the dolphin immediately to the north of the Compress wharf. (See sketch). The ship's officers testify that they did not believe that this line would stand the strain and that the dolphin was bending and the line was stretched perilously close to breaking and so this line, under orders from the Master, was payed out as slowly as possible in an effort to check the swing of the ship. It would seem that it would have been better to risk the danger of the line parting in the hope of saving the situation. In the meantime, The Hinton, a tugboat that was lying at a wharf immediately to the northward or up stream and was ready to move, seeing the predicament of the ship, put out and came on the port quarter of the vessel close to the stern, threw a line aboard the ship and with its bow pressed against the side of the ship, endeavored to stem the tide and swing of the vessel. But that maneuver, while it may have had a retarding effect did not stop the movement of the ship. If the line to the dolphin which was payed out had been held fast, the two might have prevailed. In the meantime, one of the spring lines forward parted. This would seem to show that the installation to which it was fastened was sound and safe since the line parted and did not pull out the installation. The forward breast line attached to a dolphin pulled up that dolphin. The mooring to the forward deadman was cast off from the shore by orders of the Master since he stated that he realized that that line could not possibly hold and the other spring line was cast off.

There was, however, some delay in getting these lines loose and a very serious question is raised as to whether they should have been all cast off immediately in an effort to get the ship out into the channel and free of all shore installations. Opinions differ widely. It was apparently hoped, at one time, that by holding on by the bow lines paying out slowly the one stern line still attached and the pressure of the tug that the ship might be warped back into its berth.

In the meantime, steam had been gotten into the engines. This was a matter of a few minutes and the Captain described his efforts to get the ship out of harm's way by use of the engines. He had them driving alternatively forward and aft, not so much in an effort to get headway as to make his rudder available. He endeavored, by maneuvering, to get his ship out of the way so it would not collide with shore installations.

For an exact understanding of the location of the ship and its proximity to shore installations, reference should be had to the charts in evidence (Exhibit 10 and S) which show that immediately to the South (downstream) from the Compress wharf and at a distance of approximately 1200 feet was situate the pier of the S. C. Power Co. and next came the plant of the Todd Ship-

building Company. The large dry dock with which the ship eventually collided was moored at the Todd pier but to the north there was another and smaller dry dock on which some men were working at this time. There was testimony from Compress, from the ship, and from the Captain of the tugboat, Hinton, that there was grave danger as The Southport swung that it would collide with this small dry dock and crush it and perhaps cause loss of life. As a matter of fact, The Hinton cast off eventually and desisted in its work because it found that the force of The Southport driven by the tide overcame the pressure of The Hinton and the latter was in danger of being crushed between the drifting ship and the shore line. The maneuvering of the ship continued. The ship got farther out and missed the little dry dock and, as a matter of fact, its movement was so impeded that when it did come in contact with the large dry dock, there was no appreciable jar or shock but it merely rested against it. The damage to the dry dock seems, therefore, to have been really done by the weight of the ship resting against it and crushing it in rather than from any sharp or violent blow.

This impact slowed up the movement of the ship and it was, by this time, out in the channel. The ship suffered some damage but not enough to cause it to lay up for repairs and, as a matter of fact, its repairs were not done until some months later. The ship was taken in tow by another tugboat and did not return to the Compress wharf since it had almost completed its loading and, at any rate, the ship was due to call at another pier higher up the river later in the day and it proceeded there and went about its business. Such lines as had not been hauled aboard the ship and had been attached to the wharf were taken by truck to the other mooring place.

And that is substantially the story of what happened, and we now have to consider whether there was negligence and if so, of what it consisted and what parties are responsible. First, it is quite easy and simple to determine that the libellants, the owners of the dry dock and pier, are entitled to recover the full amount of damages sustained by them which amounts have been stipulated.

The issues, therefore, to be determined are: (1); is the ship alone responsible because of its negligent mooring and handling; (2); is the Compress alone responsible because of its faulty installations and mooring facilities; (3); are both the ship and the Compress liable to the libellants? And then after answers are obtained to those three questions, there comes the question of the cross-libels as between ship and Compress. Each of these suffered certain damages and each claims that the other is responsible therefor and so that is the final question that must be answered.

The rules of law by which this case must be judged seem to be quite clear. As to the responsibility of a drifting ship, see The Louisiana, 3 Wall. 164, 18 L.Ed. 85; The Newa, 4 Cir., 267 F. 115; The Severance, 4 Cir., 152 F.2d 916; South Carolina State Highway Department v. U. S., D.C., 78 F. Supp. 598, affirmed, 4 Cir., 171 F.2d 893. And as to the liability by the owner of a wharf, see Pacific Mail S. S. Co. v. Panama R. R. Co., 2 Cir., 251 F. 449; The B. B. No. 167, D.C., 22 F.Supp. 55; The Mary Seagrave, 1936 A.M.C. 795.

Taking up the first three questions as a group, I do not find much difficulty in answering them. I find that undoubtedly there was fault on the part of the ship for which it must be held responsible to the libellants. The mooring of the ship may be severely criticized. We have a perfect example of good mooring practice used on the forward part of the ship, and we have the mooring aft quite different and quite unsafe. I make no criticism of the method of passing the lines and fastening them to the deadman. That mooring device was placed there for the very purpose for which it was used and the ship had a right to use it and expect it to be sound and reliable. However, instead of putting a breast line directly to the dolphin or some other mooring device and using spring lines aft as they did forward, a short cut was used and just the one line was fastened to the dolphin on the north end of the wharf and that line was really neither a true spring line nor a breast line.

As used it was meant to act as both. But wasn't this a make-shift and putting too much trust in one line where two or three could have and should have been used? The ship's answer to this is that there were no other mooring devices that could have been safely used. But this is not wholly true. By reference to the sketch, it will be noticed that I have superimposed certain red spots and marks. These represent, respectively, a cleat and a bitt. There were four mooring devices along the edge of this wharf, two of these appear on the sketch; the one to the southmost was a metal bitt (where "wooden bollard" was marked). Next, there was a steel cleat (shown on the sketch). Next there was a cleat and then a metal bitt (see red marks indicating these on sketch). The testimony on behalf of Compress was that the cleat and bitt to the northward portion of the wharf were not used by the Southport but were good sound mooring devices and should have been used. There was some testimony on behalf of the ship that these devices were not safe. The bitt had originally been a double bitt like the one to the south but it was shown that about one-third of this bitt had been broken off and there was only one upright portion which could be used for mooring. However, there is not a shadow of a doubt but that this bitt (although only one line could have been used in it rather than two) was a sound, substantial mooring device to which a spring or breast line could have been safely fastened. The criticism of the unused cleat was that the one there had some play in it and that it could be lifted a few inches from the wooden blocks on which it rested. However, photographs of this cleat showed it to be of heavy construction. It was bolted through very heavy timbers and securely fastened underneath and there was ample testimony that this cleat had been used frequently by other ships and was still in use for mooring. I see of no reason why this cleat should not have been used. As a matter of fact, an indication of the strength and security of these installations on the face of the wharf is the fact that one of the spring forward lines actually parted without breaking or hurting the cleat. All of the hawsers were of similar type texture and apparently in good condition; and if the cleat holding the forward part of the vessel was strong enough to break a hawser, it is fair to assume that the other ones would have been equally or at least partially useful. And so it seems to me that considerable criticism may be leveled at the manner of mooring the ship. And if it had been moored aft as it was forward, we would never have had to decide this case.

There is also considerable criticism of the ship for the manner in which it was originally berthed. It appears that in Charleston Harbor, there is a large amount of silt brought down by the Cooper River. The amount of this has very materially increased since in recent years the construction of the Santee-Cooper Navigation and Power Project of the Santee River has carried a large flow of water by canal across to and into the Cooper River. The Santee is a muddy river carrying a large amount of silt and much of this now comes down the Cooper and, when it gets along the harbor installations of Charleston, is deposited. There is testimony to the effect that this silt is sometimes deposited to an extent of almost a foot a month and that the dock opposite the Compress wharf must be dredged out from time to time. On the other hand, this silt is very soft and water front witnesses stated that ships can be easily, without fear of damage, berthed in this silt or take what is called a mud berth. The testimony was conflicting as to the depth of water. Those in charge of docking the ship say that she went alongside of the wharf in water and was not in mud. Others suggest that she must have a mud berth since she seemed to move out from the wharf easily and it was extremely difficult to heave her back into the wharf. The testimony here is conflicting, and it is difficult definitely to ascertain the truth as to these claims. It may be that the condition of this dock was such that heaving a ship in was more difficult than if the ship lay in clear water. On the other hand, there can be no doubt but that mooring facilities are installed with the idea of standing great strain and that a ship must necessarily be heaved in by being attached to shore installations and that it has a right to rely upon

them, not only to hold it but to bring it back to its position if it has moved away. And so I do not decide the case upon that point.

But a more searching criticism is directed by both libellants and Compress as to the management of the ship after it broke loose. Several so-called experts were used and different witnesses explained how if they had been in command of the ship, they would have done things differently from the way the Master handled it. The evidence shows that what the Master did did not bring about the best results. However, they certainly did minimize the situation and whether or not his maneuvers and handling of his helm were the best methods possible under the circumstances, it is a fact that the ship escaped crushing the small dry dock, with the workmen aboard, and lodged alongside of the large dry dock rather than striking it with a violent blow. And while the money damage is large, it might have been considerably larger if the Captain had not taken these various steps. We must also consider that it is much easier, years after a thing of this kind occurs, to study charts, plats, plans, maps, and sketches and handle models and point out that this or that step would have been better than what was done. But the Master in charge of this vessel was caught in a great emergency. He was in his office when the ship broke loose and when he came out on the deck, he found his vessel caught in a strong tide and drifting fast, getting away from the shore and liable to crash into various shore installations down stream. He took what steps seemed to be best at the time. I would not say he was specifically negligent in any respect, but I do have to find as between the vessel and the shore installations that the faulty mooring of his vessel and the unproductive results of his maneuverings render his ship liable to the libellants.

This brings us next to the responsibility of Compress. Compress was in business to furnish cotton cargo to vessels. The Company had a large warehouse. It handled thousands of bales of cotton, disposed of the same and furnished docking facilities to vessels to come alongside and take cargo. Of course, it was, in no way, an insurer of the vessel's safety. But the vessel had a right to be furnished with reasonable and ordinary docking facilities and these, of course, included mooring devices. When a ship comes alongside of a wharf, it has to be tied up securely. The duty of performing this is upon the ship but the duty of furnishing reasonably safe and sound objects to which to tie her is the responsibility of the wharf owner. Did Compress do this? It is true that the docking master determined what lines should be placed and Compress points out that there were four mooring devices along the face of its wharf in addition to two dolphins and two deadmen and that it did all that could be reasonably expected. I have already discussed the cleats and bitts on the wharf. Two of them are under criticism and were not used. Apparently, they were not as good as the other two that were used, but I have already determined that the ship should have used them. The dolphins were used and the ship had a right to rely upon the fact that they were sound and should hold. But it was shown that the southernmost dolphin when put to the strain of a drifting ship pulled up. Now this is not suggested as causing the catastrophe because, as a matter of fact, the forward lines were properly placed. But it does show that the mooring devices were not very sound. And there is considerable testimony that the northernmost dolphin to which the line from the aft quarter was attached was not strong. There is testimony that this dolphin was bending and giving and the men aboard ship did not think it would hold. But the most flagrant failure to furnish a sound mooring device is the northernmost deadman. When we consider the long lines that ran from the ship to that installation, running straight-away and practically at a level, it is almost impossible to conceive of how this could have come out of the ground unless we assume that there was little if any earth on top to hold it down. Yet this entire fourteen foot log was torn up out of the ground and without the parting of the manila hawsers or breaking of the steel cable or the shackle, this thing

was dragged intact across and along the shore line and down to the water front. The only reasonable deduction is that either it was never properly and securely imbedded or that the earth covering had been washed or otherwise taken away and that there was nothing to hold it in and down. There is testimony that it had been buried six feet deep. But there is other testimony that the hole in the ground was only three feet deep and full of water and also that the surrounding area was low and wet. And there is an appalling absence of any testimony from the people who built this mooring. True, a statement is made on the record that two men named "Jack" and "Dan" built it some years ago. But there is nobody who even knows the last names of Jack and Dan. There is no construction company or contractor called to say when, how or by whom this was built, and worst of all, there is not a single endeavor to prove that it has ever been inspected or looked at by any representative of Compress to see if it was in a sound, safe, or proper condition. It seems to me that this is an appalling lack of due care. Irrespective of the other mooring devices, the ship did rely upon this deadman to hold it. If the lines had parted, no blame could have been put on Compress but the two ordinary manila hawsers remained intact and the deadman came out of the ground. If this had not happened, again we would not have had to consider this evidence or pass upon this case. This was the initial and the most grievous cause of the catastrophe. And so I am constrained to find that Compress was negligent and must be held liable also to libellants.

The foregoing discussions of questions one and two contain the answers to question three. I find that both the vessel and Compress are liable to libellants and I am of the opinion that libellants are entitled to enter up judgments for their respective amounts of their damages against both of the other parties, such judgment to be joint and several.

■ Since I am convinced there was negligence by both respondents, that is to say, the vessel and its owners and Compress, and that libellants are entitled to joint and several judgments against all of them, there remains only one other issue; that is to say the claims of these parties against each other. Under the stipulation, it is agreed that the damages to the ship amounted to $2,862.15 and the damages to the Compress property amounted to $2,122. In my view of the matter, both of these parties have been negligent. Without the negligence of the ship in improperly conducting the mooring operations, none of these disasters would have occurred. And I am equally convinced that if the deadman had been properly placed and had been such a safe mooring as any wharf owner is required to furnish, there would have been likewise no accident and collision. It is practically impossible to balance the respective faults and this case shows the soundness and value of the rule in Admiralty that allows divided damages. For authority for this position, see Atlee v. Packet Company, 21 Wall. 389, 395, 22 L. Ed. 619; The North Star, 106 U.S. 17, 22, 1 S.Ct. 41, 27 L.Ed. 91. I adopt that view and take the position that in respect to the cross-claims between the respective respondents, that all their damages be divided.

Appropriate findings of fact and conclusions of law will be filed.

Let proctors for libellants present a decree in accordance with the conclusions reached and carrying all of the same into effect; and providing that in case the judgments in favor of libellants be satisfied by one of the respondents, such party may be subrogated as against the other party respondent to the extent of its payment of more than one-half of the damages as found.