**CITY COMPRESS ·& WAREHOUSE CO. et al. v. UNITED STATES et al.**

**The SOUTHPORT.**

**No. 6266.**

United States Court of Appeals, Fourth Circuit.

Argued June 20, 1951.

Decided July 20, 1951.

George L. Buist, Charleston, S. C. (Buist & Buist, Charleston, S. C., on the brief), for appellant, City Compress & Warehouse Co.

Harold A. Mouzon, Charleston, S. C. (Moore & Mouzon and B. Allston Moore, Charleston, S. C., on the brief), for appellant, South Atlantic S. S. Line, Inc.

George L. Varian, New York City (Hagood, Rivers & Young, Charleston, S. C., and Crowell & Rouse, New York City, on the brief), for appellee, Todd Atlantic Shipyards Corp.

William T. Foley, Jr., Atty. Dept. of Justice, Washington, D. C. (Holmes Bald-

ridge, Asst. Atty. Gen., Ben Scott Whaley, U. S. Atty., Charleston, S. C., and J. Frank Staley, Sp. Asst. to Atty. Gen., on the brief), for appellee, United States.

Before PARKER, Chief Judge, and SOPER and DOBIE, Circuit Judges.

DOBIE, Circuit Judge.

This consolidated case on appeal commenced as two separate cases. In one, the United States of America filed, in the United States District Court for the Eastern District of South Carolina, its libel against the Steamship Southport and the South Atlantic Steamship Lines, Inc., (hereinafter called Atlantic); and in the other suit Todd Atlantic Shipyards Corporation (hereinafter called Todd) filed, in the same court, its libel against the same respondents. In each case the original respondents took proper steps to implead City Compress & Warehouse Company (hereinafter called Compress), on the ground that the latter was legally responsible for the damages suffered by the libellants. The impleaded-respondent filed answers and cross-libels, and the latter were duly answered. The two cases, by proper order, were consolidated for trial, and by subsequent order were consolidated for appeal.

Sometime prior to daylight on January 15, 1949, the Steamship Southport arrived in Charleston harbor, where she was met by a harbor pilot and guided up the Cooper River to the Compress wharf. At this time, the tide was flooding, so in accordance with good nautical practice, the vessel was moored against the tide with her bow downstream in a southerly direction and with her starboard side against the face of the wharf.

The forward part of the vessel was secured by four lines. The first line ran from the port side of the bow to a deadman on the southern shore of the wharf. A second, or breast line, came out of the starboard bow and fastened to a dolphin, consisting of seven piles strapped together with steel bands, on the southern end of the dock. The purpose of this breast line, which ran almost perpendicular to the wharf from the vessel, was to keep the ship in close to the wharf. In addition, there were two spring lines, running almost parallel to the ship and the shore installation, one line extending from above amidship forward to a metal bitt on the dock, and the second line coming out of the starboard side closer to the bow, crossing the first spring line and connecting to a steel cleat on the dock. The function of these two lines was to prevent the ship from drifting forward or aft and to keep the ship in position at the wharf.

■ The mooring aft consisted of only three lines: a line running from each side of the stern to the deadman on the shore north of the wharf, and a third line running from the starboard side of the stern, just a little forward, to a dolphin at the northern end of the wharf. This last mentioned line was neither a spring nor breast line as it ran off to the wharf at almost a 45 degree angle. All lines used in securing the ship were of good eight inch manila hemp. Although both a cleat and bitt were located on the northern end of the pier, neither of these devices was utilized to hold the vessel aft. The choice of lines and devices on the wharf used to secure the ship was supervised by a docking master employed by the ship. Ultimate responsibility for the mooring of the vessel is, therefore, in the Southport and her owners.

By nine-thirty that morning, the lines had become slack due to the ebb of the tide. Whereupon, the Second Mate ordered the two stern lines extending to the deadman tightened in order to bring the vessel in closer to the wharf. This operation was repeated again approximately an hour later. The testimony is conflicting as to the manner in which the heaving-to of the ship was accomplished. There was no evidence, however, that the aft line to the dolphin was tightened nor were any adjustments made on the bow lines.

Shortly after eleven A.M., the officers of the Southport were warned that the stern of the ship had come loose from her mooring when the deadman to which the ship was moored pulled out, and the stern was rapidly veering out into the river, due to the push of the outgoing tide. The stern was now held only by the line to the dolphin. This line was rapidly becoming

taut to the breaking point and the dolphin was bending under the strain. The Captain, therefore, then ordered this line payed out.

Meanwhile, the tug Hinton, being at an adjacent wharf upstream and observing the plight of the Southport, determined to come to her aid. The Hinton approached the Southport on the port side and attempted to push her back to the pier.

By now the strain upon the forward lines was so great that one of the spring lines snapped and the breast line pulled the forward dolphin up from the riverbed. The Captain then ordered the two remaining bow lines cast off. All efforts of the Hinton to stem the tide were of no avail for Southport's stern had drifted out so that her bow was almost at right angles to the wharf. In this position, the Captain determined the proper maneuver was to swing his bow to starboard and his stern to port, head his ship upstream and then by the use of his engines propel the vessel forward without colliding with any of the shore installations. During this attempted maneuver, the Captain of the Southport gave no orders to the tug. In fact, the pushing of the tug on the port side of the Southport's stern was diametrically opposed to the maneuver attempted by the Captain of the Southport.

Some 1,200 feet downstream from the Compress wharf is the pier of the South Carolina Power Company. Below that installation is the Todd wharf. At the time of the accident a small floating drydock upon which men were working was anchored at the northern end of the Todd wharf. On the southern end of that wharf was moored a large floating drydock, portions of which were owned by the United States but leased to Todd, with the remaining portions being owned by Todd.

The maneuver attempted by the Southport was not entirely successful. The power of the engines was not sufficient to overcome the drift from the tide, and the tug was forced to give up her efforts in order to prevent being crushed between the swinging ship and the shore installations. The Southport, however, was able to avoid striking the small drydock but just when it appeared that her efforts might be completely successful, the force of the drift caused the ship to strike the large floating drydock at the southern end of the Todd wharf.

The damages of the various parties were stipulated as follows: Todd Atlantic Shipyards Corporation, $13,529.00; United States of America, $49,916.00; South Atlantic Steamship Line, $2,862.15; City Compress & Warehouse Company, $2,-122.00.

The District Court, 95 F.Supp. 331, found Atlantic and Compress jointly liable to Todd and the United States. The court below also determined that between the Southport and Compress the damages should be divided and gave judgment in favor of the ship for half of the excess of its damages and those of the wharf owner.

The main question presented by this appeal is whether the District Court erred in finding both Compress and Atlantic guilty of negligence contributing to the collision, and, therefore, jointly liable. After a careful examination of the record, we conclude that the decision of the lower court must be affirmed.

■ Turning first to the negligence of Compress, we think it is clearly established that a wharfinger must exercise reasonable care to provide safe facilities for vessels using its docks. See Smith v. Burnett, 173 U.S. 430, 19 S.Ct. 442, 43 L.Ed. 756; Berwind-White Coal Mining Co. v. City of New York, 2 Cir., 135 F.2d 443; Stevens v. Maritime Warehouse Co., 2 Cir., 263 F. 68; Morey v. City of New Rochelle, 2 Cir., 254 F. 425. This duty was violated when the deadman to which the Southport's stern was connected pulled up.

The normal method of constructing a deadman is to bury a log some six to eight feet in the ground. This log is then strengthened by driving piling in a diagonal direction across the log. Around the log is attached a steel cable which comes up out of the ground and fastens to a shackle. It is to this shackle that the ship's hawsers are attached.

■ The facts show that the deadman in question was put in sometime in April,

1946. Compress, however, failed to introduce any testimony as to how this deadman was constructed, nor was any evidence produced to show that Compress's employees ever examined or inspected the device once it was installed. There was some evidence that the soil over the deadman had eroded and that the area was often covered by high water. It is argued that the failure of the deadman was due to the fact that two lines were fastened to it and unusual forces were exerted upon both at the same time. We do not think, however, that the evidence with regard to this is sufficient to overcome the presumption of negligence arising from the failure of the deadman in the absence of evidence that it was properly installed and inspected. At all events, we would not be justified in holding clearly wrong the finding of the District Judge as to its inadequacy. With respect to this he said in his opinion: "But the most flagrant failure to furnish a sound mooring device is the northernmost deadman. When we consider the long lines that ran from the ship to that installation, running straightway and practically at a level, it is almost impossible to conceive of how this could have come out of the ground unless we assume that there was little if any earth on top to hold it down. Yet this entire fourteen foot log was torn up out of the ground and without the parting of the manila hawsers or breaking of the steel cable or the shackle, this thing was dragged intact across and along the shore line and down to the water front. The only reasonable deduction is that either it was never properly and securely imbedded or that the earth covering had been washed or otherwise taken away and that there was nothing to hold it in and down. There is testimony that it had been buried six feet deep. But there is other testimony that the hole in the ground was only three feet deep and full of water and also that the surrounding area was low and wet. And there is an appalling absence of any testimony from the people who built this mooring. * * * There is no construction company or contractor called to say when, how or by whom this was built, and worst of all, there is not a single endeavor to prove that it has ever been inspected or looked at by any representative of Compress to see if it was in a sound, safe, or proper condition. It seems to me that this is an appalling lack of due care. Irrespective of the other mooring devices, the ship did rely upon this deadman to hold it. If the lines had parted, no blame could have been put on Compress but the two ordinary manila hawsers remained intact and the deadman came out of the ground." [95 F. Supp. 340.]

With this conclusion we must agree.

■ We also find that the Southport was negligent on at least two grounds. It is quite apparent that the ship's moorings aft were improper. It is indeed difficult for the ship to explain its failure to make use of the cleat and bitt on the northern end of the wharf. We most heartily concur in this statement by Judge Waring: "The mooring of the ship may be severely criticized. We have a perfect example of good mooring practice used on the forward part of the ship, and we have the mooring aft quite different and quite unsafe. I make no criticism of the method of passing the lines and fastening them to the deadman. That mooring device was placed there for the very purpose for which it was used and the ship had a right to use it and expect it to be sound and reliable. However, instead of putting a breast line directly to the dolphin or some other mooring device and using spring lines aft as they did forward, a short cut was used and just the one line was fastened to the dolphin on the north end of the wharf and that line was really neither a true spring line nor a breast line. As used it was meant to act as both. But wasn't this a make-shift and putting too much trust in one line where two or three could have and should have been used?"

The Captain of the Southport was also negligent in his maneuvering after the vessel was adrift. It appears to us that he acted most impudently in failing to give any orders to the tug, Hinton. Under the maneuver attempted, it was necessary to turn the Southport's stern to port, yet the Captain allowed the Hinton to continue pushing the stern on the port side, diametrically opposed to the success of his

plan. Such action was clearly negligent. Several expert witnesses convincingly testified that the maneuver undertaken by the Southport was not the wisest choice available. These experts also pointed out courses of action which, if undertaken and properly executed by the ship, might have avoided the instant collision.

On the record before us, we cannot hold the determinative findings of the District Court to be erroneous. Since we must uphold the findings of the District Court that both Atlantic and Compress were at fault, and that the negligence of both contributed to the collision, the decision of the District Court is affirmed.

Affirmed.