**TRADE & TRANSPORT, INC.**

v.

**CARIBBEAN STEAMSHIP COMPANY, S.A., and Reynolds Metals Company.**

**Civ. A. No. 72–C–5.**

United States District Court,
S. D. Texas,
Corpus Christi Division.

Oct. 7, 1974.

J. Michael Mahaffey, Corpus Christi, Tex., for Trade & Transport.

Joseph Newton, Houston, Tex., for defendant Caribbean Steamship Co.

Robert M. Contois, Jr., New Orleans, La., for defendant Reynolds.

William H. Keys, Corpus Christi, Tex., for cross-plaintiff Reynolds.

## MEMORANDUM AND ORDER

OWEN D. COX, District Judge.

The Plaintiff herein, Trade Banner Line, Inc. (having been substituted as Plaintiff in the stead of Trade & Transport, Inc.) sues for alleged Hurricane Celia damage to the M/V TRADE CARRIER which occurred on August 3, 1970. The vessel is a Diesel-powered, general cargo ship. She went adrift from her moorings in one of the Reynolds Metals Company's docks on the La Quinta Channel during Hurricane Celia and she went aground. We are using, in this memorandum, the word "pier" to mean the physical structure, and the word

"dock" to include the pier and the waterway on either side of it.

This vessel had been voyage-chartered by Plaintiff to Defendant Caribbean Steamship Company, S.A. (sometimes called "Carribbean"), a subsidiary of Defendant Reynolds Metals Company. She was to transport for Reynolds Metals, from its facility called the Sherwin Plant near Corpus Christi, Texas, 18,000 tons of alumina, to Baie Comeau, Canada. The Sherwin Plant receives bauxite (all aluminum ore) and produces alumina from it. Alumina is a white, granular-powdery substance from which, through processing at other plants, aluminum is refined.

The charter party between Plaintiff owner and Caribbean charterer provided, among other things, that the vessel would present herself on or before August 7, 1970, for loading in "one safe berth Corpus Christi, Texas (in the opinion of the Master) and there load always afloat in the customary manner, . . . ." It further provided, among other things, that "the act of God . . and all and every other dangers and accidents of the seas, rivers, and canals, of whatever nature and kind whatsoever, before and during the said voyage, always excepted." Such an exception in the charter relates to both the owner of the vessel and the charterer alike.

There were two piers along the La Quinta Channel at the Sherwin Plant. The east pier, which is commonly referred to as the alumina dock, or loading dock, or Facility 90, is used for loading alumina, and it was on the west side of this pier that M/V TRADE CARRIER was first moored and from which loading had commenced. The west pier, which is commonly referred to as the bauxite, or unloading dock, or Facility 5, was customarily used for unloading bauxite. After information was received that the center of the storm would move in over Corpus Christi, loading was halted and the vessel was shifted to the west side of the bauxite pier. Ships drawing 34 to 36 feet may maneuver in these docks and could have been berthed on either side of the bauxite pier. There is shallow water over a clay bottom, which is immediately west of the bauxite dock.

The TRADE CARRIER arrived at the Aransas Pass bar at about 2000 hours on August 2, 1970. Her maximum draft on arrival was 18′6″. At that time, Hurricane Celia was reported centered about 265 miles southeast of Galveston, moving in a west and northwesterly direction. It was expected to go in up the coast from the Corpus Christi-Aransas Pass area in Texas.

When the TRADE CARRIER arrived at Reynolds Metals' alumina dock, the area was under hurricane watch but hurricane warnings were only in effect from Rockport north to Port Arthur, Texas. With the assistance of a local pilot, the TRADE CARRIER entered La Quinta Channel and tied up with her port side to the alumina pier, at approximately 2200 hours, on the 2nd of August, and loading of alumina was commenced the next day, August 3rd, at 0400 hours. Hurricane warnings were extended by the National Weather Service to include the Corpus Christi area at 0500. The winds reportedly had a maximum speed of 90 miles per hour near the center of the storm. Hurricane Celia was then expected to move inland near Corpus Christi late that afternoon, with tides of five to seven feet.

The master of the TRADE CARRIER had secured his radio watch after docking at the alumina pier. Prior to doing this, he had monitored available radio weather reports. Afterward, he received some information regarding this hurricane from the pilot who boarded to dock the vessel. There is no evidence indicating the master knew, or that the shore personnel made any effort to notify him, that hurricane warnings had been extended to include Corpus Christi. The master made no effort to keep up with the course of the storm by plotting its course, monitoring the reports being broadcast, or inquiring of others about it. There was testimony that had the captain known of the change in direction

when it was first announced by the Weather Service, he could have moved his vessel into the Gulf.

Later on during the morning, at about 0740, the master was advised by the shore personnel involved in the loading operations that Hurricane Celia was approaching. The loading equipment was pulled out. The master testified that he asked to move the vessel out into the Gulf, but the pilot said it was too late to do so. At this point, there develops a conflict in the testimony as to whether or not the master of the vessel would have been able to move out into the Gulf. There was testimony that, shortly after docking and before loading commenced, the master, when he was advised the vessel might have to put to sea because of the storm, told shore personnel he could not move back into the Gulf, if he were requested to do so, because of engine repairs being made. On the other hand, the master testified he could have moved into the Gulf on short notice and that he would have preferred to ride out the storm in the Gulf. There was no dispute that engine-room employees of the vessel TRADE CARRIER were actually working on some parts of the engine; but, the extent of the work was in question. The main engine of the vessel was used in transferring to the bauxite dock, where it was berthed during the storm.

Immediately after loading operations ceased, the master started securing the ship at the alumina dock. However, before this job was completed, the master was told to shift from the alumina dock to the bauxite pier. He remonstrated about the move and requested to remain at the alumina dock and be allowed to shift the vessel just a little bit astern. He considered this suggested location to be the safest during the storm, under the circumstances. The request was denied, and since he had never been at this place before, he felt he had to rely on those persons who were familiar with the two docks available. He testified there was no choice left to him. Under the circumstances, it appears Reynolds,

as the wharfinger, was also concerned for the protection of the alumina pier. It was the considered opinion of at least one witness that the alumina pier would not hold. So, the master started moving the vessel to the bauxite dock. The pilot came aboard at 0950 hours and the shifting to the bauxite dock started about 1010, and by 1100 the vessel was secured with her port side to the west side of the bauxite pier. At this time, the Weather Service announced Celia had intensified with peak winds at center of 115 miles per hour. During the course of these transfer operations, directions as to where the vessel should be moored were given by Reynolds and/or Caribbean. At no time did anyone advise the master of the shallow water near the bauxite dock, and to the west of it.

The lines used in mooring the vessel belonged to TRADE CARRIER, but there was some confusion as to how many lines were used. These lines consisted of both eight-inch and ten-inch circumference nylon and manilla ropes. No additional lines were requested by the master and none were offered by Defendant Reynolds. The lines were passed from the ship to fixtures on the pier and there secured by dock workers employed by Reynolds. The slack in the lines were taken out and the lines tightened by the use of the ship's winches and secured to fittings on the weather deck of the TRADE CARRIER. There were at least seven lines forward and six lines aft being used when the vessel was initially moored at the bauxite dock. Plaintiff contends the vessel was light and riding high so that the angle of the breast lines from the vessel to the pier prevented a fair lead from the bauxite pier to the vessel and thus diminished the ability to adequately secure the lines to the dock. Plaintiff claims the double bitts on the bauxite pier were constructed so that both of the uprights were vertical rather than at an angle. The fittings on the alumina pier were more nearly adequate for mooring this vessel at the time than were those on the baux-

ite pier. The mooring bitts on the east side of the bauxite pier, which would have provided a fair lead, were unavailable to TRADE CARRIER because a conveyor on the bauxite pier was in the way. All details of this operation were controlled by the ship's personnel under the supervision of the TRADE CARRIER's master, and the Defendants mentioned certain seaman-like procedures by which the lines could have been made more secure.

The strong winds struck the vessel at about 1400 hours on August 3, 1970, and, at first, pushed the TRADE CARRIER toward and against the bauxite pier, but there was no damage to the vessel during the first half of the storm. During the calm, as the eye passed over, at about 1600 hours, some of the TRADE CARRIER lines were resecured, and additional lines to the bauxite pier were put out, two forward and two aft. The mooring lines were secured to all accessible bitts on the vessel. No additional lines were attached to the mooring winches or windlasses because such equipment was not designed for that purpose. The fury of the storm, as the winds returned from a different angle than anticipated (sustained winds of 138 miles per hour and gusts much higher), tore the TRADE CARRIER from her moorings, and the vessel was blown into the shallow waters to the west of the bauxite dock. The lines had slipped from the fittings on the pier to which they were attached. The TRADE CARRIER went aground and suffered damage. However, we are not concerned here with the amount of damages. We are only seeking to find who was at fault.

1. The Court finds that when loading operations were commenced, the TRADE CARRIER was berthed at the alumina dock which was, according to the captain, a safe berth for the TRADE CARRIER when it was initially docked there, and also the safest berth at and after 0740 on August 3rd when the hurricane was approaching and the loading equipment was pulled out. However, the vessel was moved from its original berth, at the direction of Defendant Reynolds, to the bauxite dock, which was represented by them to be a safer berth. The captain of the TRADE CARRIER did not want to move. He may not have been required to move, but he had never been at these docks before and felt he had no choice other than to rely on the advice of the Reynolds' employees.

2. The Court finds that the captain shut down and secured the radio shack in the face of his knowledge that there was a hurricane in the Gulf and he made no arrangements for obtaining continued advice of the direction and fury of the storm. The shore personnel of the Defendants failed to warn him of the change in the course of the storm until they started withdrawing the loading equipment. This was in plenty of time for the TRADE CARRIER to be moved from one berth to another in the La Quinta ship channel, but not in time for the vessel to go out into the Gulf. Even though the officials of Defendants were aware that the Gulf might be the best place for a vessel to ride out the storm, they did not know the captain of the vessel would have taken the vessel into the Gulf if he had been advised in time. If he had kept abreast of the course of the storm, the captain could have moved the TRADE CARRIER back into the Gulf, which, according to the captain, would have been the safest place of any available to ride out the storm. We are satisfied that the engines were in condition to move the vessel on short notice, and to control it during the storm. Loading had commenced before the change in the storm's direction, but to cease the operation and remove the equipment would not have hindered the captain in going back into the Gulf if he had requested to move in time to do so before the bar was closed.

3. We also find that the TRADE CARRIER was directed to the westward side of the bauxite pier by wharfinger Reynolds in order to protect its own facilities as well as to protect the TRADE CARRIER. The vessel was moved from

the alumina pier because there was some concern on the part of Defendants that it would not hold, and if the vessel were blown loose added damage might occur to other facilities of Defendants in the area of the alumina dock.

4. We find that the fittings on the bauxite pier were not entirely adequate to hold the vessel in the storm; and that the lines could have been, at least some of them, more securely fastened than they were. There is no way to be sure that, had the lines been more securely fastened to the fittings by the TRADE CARRIER's crew, the vessel would not have been torn from its moorings anyway.

5. The Defendants, charterer Caribbean and wharfinger Reynolds, knew of the proximity of the shallow water near the channel which ran along the west side of the bauxite pier. Each Defendant had knowledge that, should TRADE CARRIER be torn from its mooring, it very likely would go aground. This was a dangerous condition and the master of the vessel using the wharf was not advised of it.

Now, this Court concludes that the law applicable to the facts as found is as follows:

A. The charterer Caribbean had the obligation to furnish M/V TRADE CARRIER, under the terms of the charter party, "one safe berth, Corpus Christi, Texas (in the opinion of the Master)." The captain was satisfied, apparently, that the berth at which TRADE CARRIER was initially moored was a safe berth. He secured and was not further concerned. The loading went on until hurricane warnings made further loading dangerous. This satisfied the charterer's obligation.

B. Reynolds Metals, the wharfinger, was not an insurer, but it had the obligation to exercise due care and diligence in furnishing a safe berth to TRADE CARRIER and it did not. Even if the charterer was liable to TRADE CARRIER, the ultimate tort feasor was the wharfinger under the circumstances; the charterer did not intercede to prevent the move, and it was not required to do so. Smith v. Burnett, 173 U.S. 430, 19 S.Ct. 442, 43 L.Ed. 756 (1939); Berwind-White Coal Mining Co. v. City of New York, 135 F.2d 443, 445 (2 Cir. 1943); The Eastchester, 20 F.2d 357 (2 Cir. 1927).

C. When the captain of the TRADE CARRIER secured his radio shack and thereafter failed to keep track of the course and fury of the storm, he was negligent and he breached his duty to his ship. He was not entitled to rely solely on others to keep him posted as to the course and strength of the storm. Boudoin v. J. Ray McDermott & Co., 281 F.2d 81, 84 (5 Cir. 1960). The failure of the Defendants to warn the captain of the change of the course of the storm in time for him to take his vessel into the Gulf did not constitute a lack of reasonable diligence.

D. Both the wharfinger Reynolds and the Plaintiff TRADE CARRIER, City Compress & Warehouse Co. v. United States, 190 F.2d 699 (4 Cir. 1951); United States v. Standard Oil Company of Kentucky, 217 F.2d 539, 540 (6 Cir. 1954), had some fault with regard to the securing of the vessel to the bauxite pier.

E. The charterer, Defendant Caribbean, having placed the vessel TRADE CARRIER at a safe berth (in the opinion of the master) and having no part in moving the vessel from it, there is no fault on the charterer's part.

F. The damage to the TRADE CARRIER was not the result of an Act of God. Reisman v. New Hampshire Fire Insurance, 312 F.2d 17 (5 Cir. 1963); McCloskey v. United States, 261 F.Supp. 912 (D.Or.1966).

G. There was fault on the part of Plaintiff, Trade Banner Line, Inc., and Defendant Reynolds Metals, and the loss should be divided equally between them. Commercial Transport Corp. v. Martin Oil Service, Inc., 374 F.2d 813, 819 (7 Cir. 1967); N. M. Patterson &

Sons, Ltd. v. City of Chicago, 324 F.2d 254 (7 Cir. 1963); Paragon Oil Co. v. Republic Tankers, 310 F.2d 169 (2 Cir. 1962).

It is, therefore, ordered that Plaintiff Trade & Transport, Inc., have judgment against Defendant Reynolds Metals Company for one-half (½) of the amount of whatever damages were suffered by Plaintiff as a result of the grounding of the TRADE CARRIER during Hurricane Celia; and it is further ordered that Defendant Caribbean Steamship Company, S.A., has no liability herein, and that it should have judgment in its favor.

Copies of this memorandum and order shall be furnished to all counsel. The Plaintiff shall furnish the Court with a final judgment insofar as liability herein is concerned.